**LIBERTY LAKE INVESTMENTS, INC., successor in interest to Wells B. McCurdy Trust, Plaintiff–Appellant,**

**and**

**Wells B. McCurdy, Trustee, Plaintiff,**

v.

**Harry F. MAGNUSON and Jane Doe Magnuson; Antone Plese; Sundena Plese; Orville L. Barnes and Jane Doe Barnes; University City, Inc.; McCarthy Management and Development Company; West 514, Inc., et al., Defendants–Appellees.**

No. 92–35300.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1993.

Decided Dec. 16, 1993.

**156**

Earle J. Hereford, Jr., Culp, Guterson & Grader, Seattle, WA, for plaintiff-appellant.

Leslie R. Weatherhead, Witherspoon, Kelley, Davenport & Toole, Spokane, WA, for defendants-appellees.

Before: TANG, FARRIS, and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Liberty Lake Investments, Inc. owned property on Interstate 90 between Spokane, Washington and Coeur d'Alene, Idaho, which it wished to sell to a developer for construction of a regional shopping center. It encountered various difficulties, such as signing up sufficient tenants satisfactory to the prospective anchor tenant, the Bon Marche (the Bon); negotiating a deal with the Washington Department of Transportation for improved access to the shopping center; and fighting a challenge by Spokane shopping center interests to permits for Liberty Lake.

This antitrust action primarily has to do with a last-minute appeal to the Spokane Board of County Commissioners (Board), claiming that the County Hearing Examiner Committee erred in granting Liberty Lake a permit without a new Environmental Impact Statement (EIS), and litigation in the Washington state courts alleging that the Liberty Lake zoning plan violated Washington's Environmental Policy Act (jointly, *West 514* litigation). Both proceedings were brought by West 514, Inc., which operates a tavern in downtown Spokane, and other individuals who do business in Spokane, but they were prompted and paid for by Harry F. Magnuson, the major shareholder of University City, Inc., which owns a number of shopping centers, University City, and McCarthy Management and Development Company, which manages University City's Spokane shopping center (collectively, Magnuson).

The complaint alleges that these parties conspired to mount a frivolous environmental challenge to Liberty Lake's plan to develop its tract of land for sale as a regional shopping center. On the grounds that Liberty Lake lacked antitrust standing, and that the *West 514* litigation was not sham and defendants' conduct was therefore immune from antitrust liability under the *Noerr–Pennington* doctrine, the district court granted summary judgment in favor of defendants. Liberty Lake appeals both rulings, and also argues that the district court erred in deciding the summary judgment motion while it was conducting discovery essential to opposing that motion. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I

We review de novo the district court's grant of summary judgment. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); *State Farm Fire & Casualty Co. v. Martin*, 872 F.2d 319, 320 (9th Cir.1989). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989); *Judie v. Hamilton*, 872 F.2d 919, 920 (9th Cir.1989).

## II

Liberty Lake first argues that the district court incorrectly held that it lacks antitrust standing to pursue this action. We do not resolve this issue because even if Liberty Lake does have antitrust standing, it cannot meet the test set out in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, — U.S. —, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), for the sham exception to the *Noerr–Pennington* doctrine. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961) (there may be situations where campaign ostensibly directed toward influencing governmental action is a mere sham to cover attempt to interfere directly with the business relationships of a competitor).

### A

Relying on our opinion in *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525 (9th Cir.1991), the district court held that in order to support a finding of sham, an antitrust plaintiff must show that a lawsuit is baseless and that the suit was brought as part of an anticompetitive plan external to the underlying litigation. *Id.* at 1532. Applying this test, the district court held, as a matter of law, that the *West 514* litigation was not baseless.

Since the district court's decision in this case, the Supreme Court has affirmed our decision in *Columbia Pictures* and adopted a similar, two-part test for the sham litigation exception to *Noerr–Pennington:*

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor, through the use of the governmental *process* —as opposed to the *outcome* of that process—as an anticompetitive weapon.

*Professional Real Estate Investors,* — U.S. at —, 113 S.Ct. at 1928 (footnote, citations, and quotation marks omitted).

■ Liberty Lake argues that the *West 514* litigation was objectively baseless for several reasons. First, it says that the *West 514* plaintiffs lacked standing because the injury at stake was to competitive economic interests, not to the environment. We cannot agree, however, that the *West 514* plaintiffs lacked an objectively reasonable basis for believing they had standing; indeed, the Washington superior court *held* they had standing under the State Environmental Protection Act (SEPA) when it issued a writ of review. That the Washington courts later found that the *West 514* plaintiffs failed to establish an injury to Spokane's water supply goes to the merits, not to whether they were threatened with an injury in fact on account of water contamination, or to whether they came within the zone of interests protected by SEPA.

■ Next, Liberty Lake contends that the *West 514* suit was baseless because the plaintiffs lost at every stage of the proceeding. The Supreme Court has instructed, however,

that "when the antitrust defendant has lost the underlying litigation, a court must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." *Id.* at —— n. 5, 113 S.Ct. at 1928 n. 5 (quotation marks omitted).

The Washington appellate court resolved the *West 514* plaintiffs' appeal adversely on the ground that SEPA plaintiffs must show "probable," as opposed to merely "possible," environmental harm before an EIS is required. *West 514, Inc. v. County of Spokane,* 53 Wash.App. 838, 770 P.2d 1065, 1070 *review denied,* 113 Wash.2d 1005, 777 P.2d 1050 (1989). It then affirmed the superior court's decision on the merits, holding that the proposed shopping center's threat to economic competition in downtown Spokane did not cross the "probable" threshold. The parties disagree about whether *West 514* established a new standard for recovery under SEPA, but on any view the difference between "possible" harm and "probable" harm is a matter of degree which cannot render the lawsuit objectively baseless.

■ Liberty Lake also suggests that the superior court must have determined that the *West 514* litigation was wholly without merit because it said that the plaintiffs' scientific evidence regarding potential harm to the Spokane aquifer "fall[s] far short of scientific probability or likelihood. When viewed in the context of the entire record, in light of the public policy enunciated in SEPA, those [expert] opinions are not persuasive." We do not read this statement as Liberty Lake would like. It is not a holding that the *West 514* plaintiffs' case had no chance of a favorable outcome, but rather it is a finding which reflects the weight accorded to their evidence.

Neither the Washington courts nor the Board intimated that the *West 514* suit was frivolous or objectively baseless. While not ultimately successful or of overwhelming strength, the suit was not so objectively baseless that no reasonable litigant could realistically expect success on the merits. Ac-

cordingly, Liberty Lake does not get over the "objectively meritless" hurdle, and we may not, therefore, examine defendants' subjective motivation. *Professional Real Estate Investors,* —— U.S. at ——, 113 S.Ct. at 1928.

### B

Assuming that we disagree that the first prong of the *Professional Real Estate Investors* test is met, Liberty Lake nevertheless argues that the sham exception saves its action because of Magnuson's unethical conduct of the *West 514* litigation. If there is abuse in the litigation process, Liberty Lake contends, then under footnote 6 of the *Professional Real Estate Investors* opinion it is unnecessary even to reach its two-part test.

In footnote 6, the Court declined to decide "whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." *Id.* at ——, 113 S.Ct. at 1929 n. 6. Liberty Lake points to evidence that Magnuson solicited straw parties to prosecute the *West 514* environmental challenge, that one of the plaintiffs did not wish to be a party to that litigation, that Magnuson paid the plaintiffs' legal fees, and that counsel failed to communicate settlement overtures to some of the plaintiffs. It urges that these tactics amount to fraud and misrepresentation and suffice to make the litigation sham without regard to the objective merit of the lawsuit or its proponents' motivation.

As we read the Court's footnote 6, however, it does no more than reserve the issue of whether antitrust liability may be premised on a litigant's deceptive conduct which goes to the core of a lawsuit's legitimacy, such that it is not "genuine," either in the sense of " 'having the reputed or apparent qualities or character' " (i.e., objectively "genuine") or being " 'sincerely and honestly felt or experienced' " (i.e., subjectively "genuine"). *Id.* at ——, 113 S.Ct. at 1929 (quoting Webster's Third New International Dictionary 948 (1986)).[1]

1. Footnote 6 was appended to the Court's admonition that "[t]o be sham, ... litigation must fail

to be 'genuine' in *both* senses of the word." —— U.S. at ——, 113 S.Ct. at 1929 (emphasis added).

Following its reservation of the question whether "fraud or other misrepresentations" may amount to "sham," the Court cited as analogous authority *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), which held that a patent procured by intentional fraud on the Patent Office could form the basis for a federal antitrust claim, *id.* at 176–77, 86 S.Ct. at 349–50; Justice Harlan's *Walker Process* concurrence, which emphasized that the Court's holding reached only "deliberate fraud," *id.* at 179–80, 86 S.Ct. at 351–52 (Harlan, J., concurring); and Rule 60(b)(3), which allows a party to obtain relief from judgment because of its opponent's "fraud ... misrepresentation, or other misconduct."

■ In a case involving a fraudulently-obtained patent, that which immunizes the predatory behavior from antitrust liability (the patent) is, in effect, a nullity because of the underlying fraud. Similarly, Rule 60(b)(3) enables a party to set aside an otherwise valid judgment on the ground that it resulted from an opposing party's fraudulent behavior or misrepresentation to the court. *See* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2860, at 188–89 (1973). Read in context with the entire *Professional Real Estate Investors* opinion, footnote 6 does not obviate application of the Court's two-part test for determining sham litigation in the absence of proof that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.

■ No such scenario is presented in this case. Liberty Lake relies mainly on the declaration of Darlene Compton, one of the *West 514* plaintiffs, to establish that Magnuson and the lawyers he employed misrepresented to several of those plaintiffs the nature of the litigation. In her declaration, however, Compton states that she willingly agreed to become a named plaintiff in the case because of her sincere interest in the lawsuit's stated claim for relief, namely, an updated EIS for the proposed Liberty Lake development. Compton also states that, at the time of the original appeal to the Board, she wasn't particularly concerned about who

was providing financial support for the litigation. Compton did not express a desire to withdraw from the lawsuit until the superior court issued its final ruling. That ruling was filed on March 7, 1988, nearly 13 months after the filing of the appeal to the Board and the subsequent breakdown of Liberty Lake's attempt to sell the land to a willing purchaser, ten months after the Bon withdrew its letter of intent to be an anchor tenant at the Liberty Lake mall, and eight months after Liberty Lake notified its potential buyer that it would begin to seek other developers for the property. Even without Compton's willing participation, it isn't possible to characterize the *West 514* litigation as lacking legitimacy. Nothing in the record indicates the remaining *West 514* plaintiffs were unwilling participants in the litigation. For similar reasons, the failure of the *West 514* attorneys to inform Compton of the opposing side's settlement overtures does not render the litigation illegitimate.

Liberty Lake's evidence at most goes to Magnuson's motivation, which we are precluded from examining. *Professional Real Estate Investors,* —— U.S. at ——, 113 S.Ct. at 1928. The Court's opinion makes it clear that unless a lawsuit is objectively baseless, whether an antitrust defendant "was indifferent to the outcome on the merits" of the suit, or "had decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process" is immaterial. *Id.* at ——, 113 S.Ct. at 1931 (citing as *"contra" Grip–Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 472 (7th Cir.1982), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983), in which Judge Posner suggested that "[t]he line is crossed when [the antitrust defendant's] purpose is not to win a favorable judgment against a competitor but to harass him, and deter others, by the process itself—regardless of outcome—of litigating"); *cf. id.* —— U.S. at —— – ——, 113 S.Ct. at 1935–36 (Stevens, J., concurring in the judgment but disagreeing with the majority that prosecuting a lawsuit in which the plaintiff is indifferent to the outcome but has sought to impose a collateral harm on the defendant by such things as abusing the discovery process is not sham). As the conduct upon which Lib-

erty Lake relies boils down to indifference to outcome and intent to inflict injury through collateral consequences, it is irrelevant and summary judgment was properly entered.

### III

We review for abuse of discretion the district court's denial of a Rule 56(f) motion for additional discovery prior to summary judgment. *Garrett v. City & County of San Francisco,* 818 F.2d 1515, 1518 (9th Cir. 1987).

Liberty Lake's Rule 56(f) arguments are directed toward the district court's summary judgment ruling on antitrust standing grounds. Because we affirm on *Noerr–Pennington* immunity grounds, we need not decide whether the district court abused its discretion in deciding the standing issue without allowing additional discovery.

**AFFIRMED.**