UNITED STATES of America,

v.

Carol B. TOLSON, Defendant.

No. CRIM 03–0262RCL.

United States District Court,
District of Columbia.

March 2, 2005.

---

### *MEMORANDUM OPINION*

LAMBERTH, District Judge.

This matter comes before the Court on defendant Carol Tolson's motion to withdraw the guilty plea that she entered in this case on June 30, 2003. Upon consideration of the defendant's motion, the opposition thereto, the reply, the applicable law, and the entire record herein, the Court finds that the defendant's motion will be denied. The Court's reasoning is set forth below.

### *BACKGROUND*

On June 23, 2003, Carol Tolson ("Tolson") was charged in this Court in a two-

count felony information. Count one charged Tolson with possession with intent to distribute fifty grams or more of cocaine base, and aiding and abetting the same, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii); and 18 U.S.C. § 2. In count two, Tolson was charged with using, carrying and possessing a firearm during a drug trafficking offense, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(i). Count 1 carries a statutory minimum sentence of ten years in prison; and Count 2 carries a statutory minimum sentence of five years in prison to run consecutively to any other sentence.

At a hearing held by the Court on June 30, 2003, Tolson, represented by retained counsel Archie M. Nichols, waived indictment and entered a plea of guilty to both counts of the information. At that hearing, Tolson presented to the Court a plea agreement and recital of the government's factual proffer, both of which bear her signature. The Court then conducted a standard plea colloquy pursuant to Federal Rule of Criminal Procedure 11 to ensure that Tolson understood the terms of the plea agreement, was entering her plea knowingly and voluntarily, was satisfied with her attorney's representation of her, and was aware of the rights she was waiving by pleading guilty. *See* Tr. (Plea, June 30, 2003), at 3–5. One element of the plea agreement entered into between Tolson and the government was the provision that Tolson might cooperate with the government in the hope of obtaining a downward departure for substantial assistance from the Court at the time of sentencing.

In addition, the Court reviewed the information, the plea agreement, and the government's factual proffer with Tolson to verify that she had read and understood those documents; and the Court ensured that Tolson was aware of the range of possible sentences that the Court might impose as a result of her guilty plea. *See id.* at 5–10. Specifically, the Court inquired whether "anyone [had] made any prediction or promise as to what sentence" the Court would impose, to which Tolson answered the negative. *Id.* at 9. Tolson then admitted that she was guilty of the conduct described in the government's factual proffer, and thus of the offenses charged in the information. *See id.* at 9– 10. At the conclusion of the plea hearing, the Court released Tolson on a personal recognizance ("P.R.") bond and scheduled a status conference for September 26, 2003.

At the September 26 Status Conference, the Court granted the government's motion to revoke Tolson's P.R. bond and, upon the advice of the Pretrial Services Agency, ordered that Tolson undergo drug detoxification and treatment at a residential facility. Pretrial Services recommended drug detoxification because Tolson failed to maintain regular contact with the Pretrial Services Agency and tested positive more than once for cocaine between June 30, 2003 and September 26, 2003, both of which constituted violations of the conditions of Tolson's release.

Also on September 26, Tolson filed a letter with the Court in which she complained that her attorney, Mr. Nichols, had "verbally threatened [Tolson] with words of discouragement with such comments as 'you are not going to make it out of this.'" Def.'s Mot. to Withdraw Guilty Plea ("Def.'s Mot."), Ex. A, Letter from Carol Tolson to Judge Royce C. Lamberth (Sept. 17, 2003). Tolson also opined in her letter to the Court that Mr. Nichols "seem[ed] more interested in the financial investment/outcome than in defending me." *Id.* Along with her typed letter, Tolson submitted a handwritten note to the Court in which she explained that Mr. Nichols was causing her to experience stress and fear.

*See* Def.'s Mot., Ex. B, Note from Carol Tolson to the Court (submitted Sept. 26, 2003). In both documents submitted to the Court, Tolson requested that the Court appoint her new counsel.

After Tolson completed the detoxification and treatment ordered by the Court the previous month, the Court held another Status Conference on October 24, 2003, at which time the Court placed Tolson in the Pretrial Service Agency's "New Horizons" program for long-term drug rehabilitation. Subsequently, later in October 2003, attorney Nichols filed a motion to withdraw as Tolson's counsel, citing irreconcilable differences with his client. The Court held an ascertainment of counsel hearing on December 12, 2003, at which the Court asked Tolson whether she was satisfied with Mr. Nichols' representation. She replied that she was "okay with him," Tr. (Status Conference, Dec. 12, 2003), at 3, and the Court thus found it appropriate to "leave [Nichols] in place" until the next Status Conference, set for January 16, 2004. *Id.* at 4.

At the January 16 Status Conference, the government requested additional time to obtain Tolson's cooperation following her drug rehabilitation program, which program was to be completed within 30 days. The Court granted the government's request and, in order to allow sufficient time for the government to complete its debriefing with Tolson, scheduled a Status Conference for March 12, 2004. Subsequently, the March 12 Status Conference was reset to March 19, at which time the defendant failed to appear. At a Status Conference on March 23, where Mr. Nichols was unable to produce Tolson, the Court issued a bench warrant that resulted in Tolson's arrest on March 30, 2004. That day, the Court conducted yet another Status Conference. Apparently, Mr. Nichols did not receive timely notice of the March 30 hearing, and his failure to appear at that time prompted the Court to grant Nichols' earlier motion to withdraw and appoint the office of the Federal Public Defender to represent Tolson going forward. The Court also revoked Tolson's bond and scheduled the matter for sentencing. On May 12, 2004, more than ten months after the guilty plea was entered in this case, Tolson's new counsel filed the present motion to withdraw Tolson's guilty plea.

The motion advances a single argument in favor of allowing withdrawal of the guilty plea—that attorney Nichols was burdened by a conflict of interest during the plea negotiations, resulting in his rendering Tolson ineffective assistance in determining whether to enter the guilty plea. Nichols' fee, Tolson contends, was paid by Freddie Jacobs, the same person that Tolson would have to implicate in order to prove her innocence at trial. Thus, on this argument, Nichols had a financial stake in Freddie Jacobs' not being implicated in the crimes with which Tolson was charged. Tolson argues that as a result of this conflict of interest, attorney Nichols: (1) failed to adequately explore Tolson's possible defenses during their conversations prior to her acceptance of the plea agreement; (2) encouraged Tolson to plead guilty by promising that she would be immediately released from prison and that she would be sentenced only to probation if she entered a guilty plea; and (3) discouraged Tolson from going to trial with statements such as "you are not going to make it out of this." Tolson requests that the Court hold an evidentiary hearing on her ineffective assistance of counsel claim.

## DISCUSSION

■ While an ineffective assistance of counsel claim will often provide sufficient grounds for withdrawal of a guilty plea,

withdrawal is not an "automatic right" of the criminal defendant prior to sentencing. *See United States v. Barker*, 514 F.2d 208, 218 (D.C.Cir.1975). In order to succeed on this type of motion, the proponent must satisfy the Court that the attorney conduct alleged to be deficient so corrupted the proceedings during which the guilty plea was taken as to render those proceedings either inadequate under the requirements of Federal Rule of Criminal Procedure 11 or otherwise constitutionally suspect. Here, Tolson has not made such a showing, and thus the Court concludes that her motion must be denied.

## A. Legal Standard Governing the Withdrawal of a Guilty Plea

■ Tolson brings her motion to withdraw her guilty plea pursuant to Federal Rule of Criminal Procedure 11(d) which provides, in pertinent part, that "[a] defendant may withdraw a plea of guilty ... after the court accepts the plea, but before it imposes sentence if: ... the defendant can show a fair and just reason for requesting the withdrawal." FED. R. CRIM. P. 11(d) (2004). "Permission to withdraw [a guilty plea prior to sentencing] rests in the sound discretion of the trial court." *United States v. Horne*, 987 F.2d 833, 837 (quoting *United States v. Davis*, 617 F.2d 677, 685 (D.C.Cir.1979)). For this reason, "[r]eversal of a district court's denial of a motion to withdraw a plea ... is uncommon," *id.* (quoting *United States v. Loughery*, 908 F.2d 1014, 1017 (D.C.Cir.1990)); and a district court's disposition of such a motion is reviewed for abuse of discretion only. *See United States v. Weaks*, 388 F.3d 913, 915 (D.C.Cir.2004).

■ Generally, "when a defendant seeks to withdraw a guilty plea on the basis of ineffective assistance of ... counsel the district court should hold an evidentiary hearing to determine the merits of the defendant's claims." *United States v. Taylor*, 139 F.3d 924, 932 (D.C.Cir.1998). This is because most ineffective assistance claims "involve matters outside the trial record, such as whether counsel properly investigated the case, considered relevant legal theories, or adequately prepared a defense." *United States v. Cyrus*, 890 F.2d 1245, 1247 (D.C.Cir.1989). However, "some claims of ineffective assistance of counsel can be resolved on the basis of the ... transcripts and pleadings alone." *Taylor*, 139 F.3d at 932 (citing *United States v. Fennell*, 53 F.3d 1296, 1303–04 (D.C.Cir.1995), *modified on reh'g* 77 F.3d 510 (D.C.Cir.1996); *United States v. Pinkney*, 543 F.2d 908, 914 (D.C.Cir.1976)). A hearing may not be necessary if, for example, the withdrawal motion fails to "allege sufficient facts or circumstances 'upon which the elements of constitutionally deficient performance [by counsel] might properly be found;'" *id.* (citing *Pinkney*, 543 F.2d at 916); or "the defendant has failed to present any affidavits or other evidentiary support for the naked assertions contained in [his or her] motion." *Id.*

■ Here, the Court concludes that the absence from the defendant's motion of detailed factual allegations, as well as of any affidavits, declarations, or other evidence to support the defendant's ineffective assistance claim, militates against the necessity of an evidentiary hearing according to the guidelines set forth in *Taylor*. Indeed, Nichols' challenged conduct occurred during the initial stages of these proceedings leading up to the entry of Tolson's guilty plea. Rather than having to sift through the complex series of proceedings and the volume of attorney conduct that would be involved if this were a post-trial motion, here the Court is faced with but one or two fairly simple instances of attorney conduct that are alleged to be deficient. Under these circumstances, the

Court can easily adjudicate the merit of Tolson's contentions on the basis of the pleadings and transcripts presently before the Court.

 The D.C. Circuit has recently reiterated this jurisdiction's longstanding rule that a court adjudicating a motion to withdraw a guilty plea prior to sentencing must consider: " '(1) whether the defendant has asserted a viable claim of innocence; (2) whether the delay between the guilty plea and the motion to withdraw has substantially prejudiced the government's ability to prosecute the case; and (3) whether the guilty plea was somehow tainted.' " *United States v. West*, 392 F.3d 450, 458 (D.C.Cir.2004) (quoting *United States v. Hanson*, 339 F.3d 983, 988 (D.C.Cir.2003)); *see United States v. McCoy*, 215 F.3d 102, 106 (D.C.Cir.2000) (same). The third factor is the most important, *see Horne*, 987 F.2d at 837, and requires a showing that the district court's taking of the guilty plea either failed to conform to the requirements of Federal Rule of Criminal Procedure 11, *see West*, at 458, or was in some other sense constitutionally deficient. *See Taylor*, 139 F.3d at 929; *United States v. Ford*, 993 F.2d 249, 251 (D.C.Cir.1993).

 While the Court of Appeals has "often considered the three … factors as if they were all simply to be balanced against one another in each case … none of our cases would have been decided differently if the only inquiry undertaken were whether the defendant's guilty plea was taken in compliance with Rule 11." *United States v. Cray*, 47 F.3d 1203, 1207 (D.C.Cir.1995) (citations omitted). Specifically, "prejudice to the government has never been a determinative factor" for the D.C. Circuit in evaluating a district court's decision to grant or deny a withdrawal motion. *See id.* at 1208. Indeed, prejudice to the government's ability to effec-

tively prosecute should only be relevant in close cases, as considerations of prosecutorial resources generally ought not deny a defendant the "opportunity to go to trial because he had earlier entered a defective (e.g., involuntary) guilty plea." *Id.* After all, it is without question that constitutional rights, particularly in the context of criminal prosecutions, should not often be set aside solely to avoid inconveniencing the government.

 Likewise, in this jurisdiction the first factor in the withdrawal inquiry— whether the defendant has presented a "legally cognizable defense to the charges against [him or her]"—is evaluated only after the Court determines whether the defendant has alleged a defect in the Rule 11 plea proceeding sufficient to justify granting a motion to withdraw the plea. *See Cray*, 47 F.3d at 1208. The subordination of the first factor is not so much a matter of its relative weight, as our circuit requires that the proponent of a motion to withdraw a guilty plea "make out a credible claim of legal innocence as a threshold matter," *id.* at 1206 (discussing *Barker*, 514 F.2d at 220 ("If the movant's factual contentions, when accepted as true, make out no legally cognizable defense to the charges, he has not effectively denied his culpability, and his withdrawal motion need not be granted.")), but rather has to do with "economy and … clarity" in the disposition of these sorts of motions. *Cray*, 47 F.3d at 1208. That is, where the movant for withdrawal fails to demonstrate some constitutional or procedural error in the taking of his or her guilty plea, circumstances will often justify a court's denial of a motion to withdraw that plea even where the movant makes out a legally cognizable defense to the charges. This is because our judicial system "consecrates the guilty plea as a 'grave and solemn act,' " *Horne*, 987 F.2d at 837 (quoting *Brady v. United*

*States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)), and regards the withdrawal of guilty pleas as "inherently in derogation of the public interest in finality and the orderly administration of justice." *Id.; see also Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (withdrawal of guilty pleas "undermines confidence in the integrity of our procedures; and, by increasing the volume of judicial work, inevitably delays and impairs the orderly administration of justice") (quoting *United States v. Timmreck*, 441 U.S. 780, 784, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979)). Mindful of our legal system's commitment to finality in criminal proceedings, and of the value of guilty pleas generally to the accomplishment of that important end, the D.C. Circuit has made clear that "a defendant who fails to show some error under Rule 11 has to

shoulder an extremely heavy burden if he is ultimately to prevail" on a withdrawal motion. *Cray*, 47 F.3d at 1208. Thus, when faced with a withdrawal motion, the established approach in this jurisdiction requires that the Court first and most carefully evaluate the alleged procedural or constitutional deficiency in the taking of the guilty plea before addressing the other two factors.[1]

## B. Ineffective Assistance of Counsel Generally

 Tolson alleges that her guilty plea is constitutionally deficient in that she was denied effective assistance of counsel during the period when Tolson and the government negotiated and executed Tolson's plea agreement. The broad test for determining the validity of a guilty plea is " 'whether the plea represents a voluntary

---

1. One might argue, although Tolson does not, that a strong enough showing of actual innocence would be conceptually related, or perhaps even identical, to a demonstration that the taking of the plea was constitutionally deficient. That is, if a withdrawal movant were to proffer substantial evidence that he or she simply had nothing to do with the crime charged, it might be reasonable to infer that the entry of a guilty plea must have been somehow involuntary. While this position seems to have some merit, it is not for this Court to question the analytic distinctions in the withdrawal inquiry set forth by the Court of Appeals. It is difficult to imagine a case in which this kind of situation—where the evidence of innocence is so compelling as to give rise to the inference that the entry of a guilty plea is per se involuntary—might obtain. Under such circumstances, it seems unlikely that a reasonable defendant could be effectively coerced into entering such a plea. And even if such circumstances obtained in a case, the analytic scheme set forth by the Court of Appeals would inevitably lead the court to conclude that the plea should be withdrawn, even first considering defects in the taking of the plea itself. With such strong evidence of innocence, there would likely have to be some very peculiar form of coercion involved in the entry of a guilty plea, which coercion would likely come to light in the defendant's withdrawal motion as a defect in the plea proceeding itself. Generally, then, the potential conceptual relation between the first and third factors to be considered in adjudicating a withdrawal motion does not discount the instrumental value inherent in addressing such a motion according to the scheme advanced by the D.C. Circuit. Additionally, it is not obvious that the Supreme Court's general test for the validity of plea agreements, namely whether the plea represents a "voluntary and intelligent choice among the alternative courses of action open to the defendant," *see Hill*, 474 U.S. at 56, 106 S.Ct. 366, gives on to the sort of inference just discussed. After all, it is not logically inconsistent to say that a defendant may both have access to substantial evidence of his or her innocence and voluntarily and intelligently choose to enter a guilty plea rather than present that evidence at trial. Such a decision may be unreasonable, and raise concerns for public policy—but the relevant observation is that the circumstances of the choice do not necessarily, or as an analytical matter, render the choice either "involuntary" or "unintelligent." The conceptual distinction between the presence of exculpatory evidence or arguments and the validity of a guilty plea, then, seems at least to be a rational one.

and intelligent choice among the alternative courses of action open to the defendant.'" *Hill,* 474 U.S. at 56, 106 S.Ct. 366 (quoting *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)). Here, as in *Hill,* the movant "relies entirely on the claim that [her] plea was 'involuntary' as a result of ineffective assistance of counsel" during the proceedings resulting in the entry of the guilty plea. *Hill,* 474 U.S. at 56, 106 S.Ct. 366. "Where ... a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Id.* (quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)).

■ The Sixth Amendment right to counsel "is the right to the effective assistance of counsel," *McMann,* 397 U.S. at 771, 771 n. 14, 90 S.Ct. 1441, and "[c]ounsel ... can ... deprive the defendant of the right to effective assistance [ ] simply by failing to render 'adequate legal assistance.'" *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Furthermore, "[r]epresentation of a criminal defendant entails certain basic duties [including] ... a duty to avoid conflicts of interest." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Thus, where a conflict of interest motivates defense counsel to render inadequate legal assistance during plea proceedings, the criminal defendant is deprived of his or her Sixth Amendment right to effective assistance of counsel and the plea proceeding is necessarily rendered constitutionally deficient for the purposes of the third factor evaluated on a withdrawal motion.

■ In *Strickland v. Washington,* the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel generally. *See* 466 U.S. at 687–94, 104 S.Ct. 2052. Under the *Strickland* approach, the proponent of the ineffective assistance claim, in order to prevail, must demonstrate: (1) "that counsel's representation fell below an objective standard of reasonableness[;]" *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. The addition of the second, or "prejudice" component of the *Strickland* test was predicated on the Supreme Court's conclusion that "'[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding, if the error had no effect on the judgment.'" *Hill,* 474 U.S. at 57, 106 S.Ct. 366 (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). The Supreme Court in *Hill* extended the *Strickland* framework to govern challenges to guilty pleas based on ineffective assistance of counsel, *see id.* at 58, 106 S.Ct. 366, and held that, in the guilty plea context, the "'prejudice' requirement [of *Strickland* ] ... focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 59, 106 S.Ct. 366. More specifically, "in order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

■ The D.C. Circuit has adopted the *Strickland* approach when reviewing ineffective-assistance challenges in our jurisdiction, including such challenges to guilty pleas. *See United States v. Farley,* 72

F.3d 158, 164 (D.C.Cir.1995) (applying *Strickland–Hill* approach in reviewing ineffective-assistance challenge to guilty plea); *cf. United States v. Toms,* 396 F.3d 427, 429 (D.C.Cir.2005) (applying *Strickland* test in reviewing ineffective-assistance challenge to criminal convictions); *United States v. Eli,* 379 F.3d 1016, 1018 (D.C.Cir.2004) (applying *Strickland* test to ineffective-assistance challenge to sentencing). Generally, then, the proponent of a withdrawal motion predicated on ineffective assistance of counsel must demonstrate both that defense counsel's performance failed to conform to an objective standard of reasonableness and that the unreasonable performance prejudiced the defendant's position.

## C. Ineffective Assistance Caused by a Conflict of Interest

■ Straightforward application of the *Strickland* test is only the general rule for ineffective-assistance inquiries. Where, as here, the ineffective-assistance claim alleges that defense counsel's deficient performance resulted from a conflict of interest, the claimant may avoid the burden of demonstrating prejudice under *Strickland. See United States v. Gantt,* 140 F.3d 249, 254 (D.C.Cir.1998). The Supreme Court has held that a criminal defendant makes a showing sufficient to support a finding of constitutionally deficient representation where he demonstrates that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). "By making the required showing under *Cuyler,* a defendant avoids the more stringent two-part test for ineffective assistance set forth in *Strickland,*" as satisfaction of the *Cuyler* standard gives rise to a presumption of prejudice to the defendant's interests. *Gantt,* 140 F.3d at 254. *See also Farley,* 72 F.3d at 166; *United States v. Thomas,* 114 F.3d 228, 252 (D.C.Cir.1997).[2]

■ Courts in this jurisdiction are generally hesitant when a defendant attempts to "force [his or her] ineffective assistance claims into the 'actual conflict of interest' framework ... and thereby supplant the strict *Strickland* standard with the more lenient *Cuyler* test." *United States v. Bruce,* 89 F.3d 886, 893 (D.C.Cir.1996) (citing *United States v. Leggett,* 81 F.3d 220, 227 (D.C.Cir.1996); *Farley,* 72 F.3d at 166). Thus, "the [mere] possibility of conflict is insufficient to impugn a criminal [judgment]," *Cuyler,* 446 U.S. at 350, 100 S.Ct. 1708; and an actual conflict of interest does not arise from every ethical lapse, *see Bruce,* 89 F.3d at 893–94, from mere "friction between trial counsel and the court," *United States v. Shark,* 51 F.3d 1072, 1076 (D.C.Cir.1995), from "a misunderstanding between a defendant and trial counsel on trial tactics," *Taylor,* 139 F.3d at 931 (citing *Leggett,* 81 F.3d at 227), or from "a hypothetical conflict having no real effect on trial counsel's representation." *Id.* (citing *Cuyler,* 446 U.S. at 350, 100 S.Ct. 1708; *Bucuvalas v. United States,* 98 F.3d 652, 657 (1st Cir.1996); *United States*

---

**2.** This is so because an attorney who operates under a conflict of interest "breaches the duty of loyalty [to his client], perhaps the most basic of counsel's duties." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. The Supreme Court elaborated on the rationale for the presumption of prejudice upon a showing of an actual conflict of interest, explaining that

it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiries in certain situations likely to give rise to conflicts ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

*Id.*

*v. Gambino,* 864 F.2d 1064, 1070 (3d Cir. 1988)).

■ To make out a successful ineffective-assistance claim under *Cuyler,* and thus avoid the prejudice requirement of *Strickland,* a defendant must show (1) that her attorney "actively represented conflicting interests[;]" *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; and (2) that "the conflict 'adversely affected [her] lawyer's performance.'" *United States v. Taylor,* 139 F.3d 924, 930 (D.C.Cir.1998) (quoting *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052); *see also Gantt,* 140 F.3d at 254 (*Cuyler*'s requirement that the conflict "adversely affect" the representation means the defendant must show that "the conflict had some negative effect upon his defense (defined as an actual lapse in representation)"). In other words, "a defendant [must] show that his counsel advanced his own, or another client's, interest to the detriment of the defendant." *Taylor,* 139 F.3d at 930. "If an attorney fails to make a legitimate argument *because* of the attorney's conflicting interests . . . then the *Cuyler* standard has been met." *Id.* (quoting *Bruce,* 89 F.3d at 896 (emphasis in original). Additionally, the requirement that there be a causal relationship between the professed conflict and the attorney's allegedly deficient conduct entails that the attorney must have knowledge of the circumstances giving rise to the conflict in order for it to rise to the level of an "actual conflict" within the meaning of *Cuyler. See id.; United States v. Hopkins,* 43 F.3d 1116, 1117 (6th Cir.1995) ("A conflict is hypothetical [rather than actual] where, as here, the attorney does not in fact know of the conflict . . . .").

■ Satisfying the *Cuyler* test is easier in a case where defense counsel jointly represents two or more defendants whose interests conflict, as "'the attorney cannot serve both clients adequately. . . . [and thus] must fail one or do nothing and fail both.'" *Taylor,* 139 F.3d at 930. (quoting *Perillo v. Johnson,* 79 F.3d 441, 447 (5th Cir.1996)). However, where joint representation is not the source of the alleged conflict, "the defendant's burden is to show that counsel *actually acted* in a manner that adversely affected his representation by doing something, or refraining from doing something, *that a non-conflicted attorney would not have done." Id.* (citing *United States v. Soldevila–Lopez,* 17 F.3d 480, 486–87 (1st Cir.1994)) (emphasis added).

■ An important background principal in these sorts of inquiries, emphasized by the Supreme Court, bears repeating here.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation [of attorney conduct], *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;* that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)) (emphasis added). A specific derivative of this general principle that is particularly applicable on the present motion advises that "courts generally presume that counsel will subordinate his or her pecuniary interests and honor his or her professional responsibility to a client." *Taylor,* 139 F.3d at 932 (citing *United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir.1997); *United States v. Jeffers,* 520 F.2d 1256, 1265 (7th Cir.1975) (Stevens, J.)). The Court's application of the above-recited legal standards governing attorney conduct in criminal cases, then, will be informed as well by these background presumptions against finding ineffective assistance.

## D. Tolson's Ineffective Assistance Arguments

Tolson challenges as constitutionally deficient three separate actions taken by Nichols during the proceedings leading up to the entry of Tolson's guilty plea: (1) Nichols' admonitions that Tolson was "not going to get out of this;" (2) Nichols' alleged failure to adequately advise Tolson of the possibility of shifting blame to Freddie Jacobs as a viable trial strategy; and (3) Nichols' alleged assurances that Tolson would receive only probation if she entered a guilty plea and his failure to otherwise adequately advise her of the consequences of pleading guilty. Tolson argues that each of these actions was designed to coerce her consent to the plea agreement, and that Nichols undertook to ensure that she plead guilty in order to serve the interests of Freddie Jacobs, who allegedly paid Nichols' fee for defending Tolson. According to Tolson, "[t]he course that Mr. Nichols pursued in this matter is precisely the course an attorney would follow who was hired in an obvious conflict of interest, who recognized that conflict, who wanted to continue to be paid, who did not wish for his employer or the Court to discover the conflict, and who did not have his client's best interest alone at heart." Def.'s Reply at 6. The Court will address each of the cited instances of conduct separately, first to determine whether Tolson has made out a *Cuyler* claim of actual conflict of interest, and second to determine whether, in the absence of any cognizable *Cuyler* claim, Tolson has nevertheless made out a claim of ineffective assistance under *Strickland.*

Again, in order to satisfy the *Cuyler* standard, a defendant must show: (1) that defense counsel actually represented conflicting interests; (2) that defense counsel took some action or actions to advance his own or another's interests at the expense of the defendant's interests—that is, that defense counsel took some action that a non-conflicted attorney would not have taken; (3) that the challenged action did in fact adversely effect the defendants interests; and (4) that defense counsel took the challenged action with knowledge of the conflict of interest. The second element requires a showing of causation—that is, the defendant must demonstrate that counsel's took the challenged actions because of the alleged conflict of interest. The third element requires a showing that the actions taken had some adverse effect on the defendant's interests. While the defendant need not show, as *Strickland* would require, that the outcome of the proceedings would have been different but for the challenged attorney conduct, *Cuyler* does require that the defendant demonstrate at least that the challenged attorney conduct was theoretically adverse to her interests. In other words, even if Tolson would have plead guilty in any event, she must show that Nichols' actions were inconsistent with her interests in order to establish a *Cuyler* conflict.

■ The Court need not reach the question whether Nichols' actions adversely impacted Tolson's interests, however, as Tolson fails to demonstrate a causal link between the alleged conflict of interest and Nichols' challenged conduct, and thus cannot make the second showing necessary to establish an "actual conflict" under *Cuyler*. Even if the Court assumes, *arguendo*, both that Nichols was in fact paid by Freddie Jacobs and not by some other third party, and that Jacobs' interests are in fact adverse to Tolson's, there is simply nothing in Tolson's motion, reply, or exhibit letter that even begins to establish that Nichols took any actions before or during the plea proceedings *because of* Jacobs' payment of Tolson's defense fee. Other than the bare assertion to that effect, then, there is nothing in the record to persuade the Court that the conflict between Jacobs' and Tolson's interests actually motivated any of Nichols' actions. Thus, there can be no showing of an actual conflict of interest under *Cuyler*.

In fact, there is no evidence or proffer of any evidence to prove that Jacobs actually was the individual that paid Nichols' fee. Indeed, the government proffers Nichols' testimony that the payor claimed to be a member of Tolson's family, which Jacobs is not. *See* Gov't's Opp. at 3 n. 1. Furthermore, even if Jacobs did pay Nichols' fee, there is no evidence and no proffer of any evidence to demonstrate that Jacobs ever gave Nichols any sort of instructions regarding Nichols' representation of Tolson. As such, there is nothing in the record to indicate that Nichols had any reason to believe Jacobs would have desired that Nichols take or omit certain actions in his representation of Tolson,[3] or to indicate that Nichols acted on any knowledge of Jacobs' desires if he did have knowledge of them.

Indeed, the Court finds the allegation that Nichols' challenged conduct resulted from this particular conflict of interest implausible. If one assumes for the moment that Tolson's only defense at trial would indeed be to implicate Jacobs, and if one assumes (probably correctly) that Jacobs had a substantial interest in ensuring that he was not implicated in the crimes with which Tolson was charged, then it follows that he would have instructed Nichols not to allow Tolson to enter into a plea agreement under which she would have to cooperate in the government's attempts to bring criminal charges against Jacobs in order to receive a downward departure from the sentencing guidelines. In a case where the court found that a defense attorney *did* render ineffective assistance by advancing the interests of an individual who paid several defendants' legal fees and who might have been implicated in the crimes with which the defendants were charged, the defendants produced evidence that: (1) the payor of the fees had actually directed, to some extent, the attorney's representation of the defendants; and (2) the attorney advised the defendants *not* to enter into cooperation agreements with the government. *See United States v. Duran–Benitez*, 110 F.Supp.2d 133, 151–53 (E.D.N.Y.2000) ("[W]hen a defendant's lawyer is hired and paid by the operator of the alleged criminal enterprise ... there is a real risk that the lawyer will prevent his

---

**3.** Importantly, this failure of proof means that Tolson cannot demonstrate that Nichols had knowledge of a conflict between the interests of Jacobs and Tolson. The Court might be willing to infer that Jacobs' interests were adverse to Tolson's, based on his potentially being implicated in case. However, as there is no evidence that Jacobs and Nichols ever communicated, there is certainly no reason to suspect that Jacobs communicated his interests to Nichols, or that Jacobs ever conditioned payment of Tolson's fee on Nichols' willingness to compromise Tolson's defense to advance Jacobs' interests.

client from obtaining leniency by preventing the client from offering testimony against his former employer . . . .") (internal quotations, citations, and brackets omitted). *Cf. United States v. Martinez–Zayas*, 655 F.Supp. 682, 683–84 (E.D.Pa. 1987) (finding that "[t]he defendant's interest in cooperation with the government in this case is . . . opposed to the interests of the other individual who is under investigation" and who paid the defendant's legal fees). Perhaps some conduct, such as advising Tolson not to agree to cooperate with the government and also advising her not to testify at trial, might give rise to the inference that Nichols acted to advance Jacobs' interests in not being implicated in the present charges. Active pursuit of a plea agreement including a cooperation provision, however, seems to give rise to just the opposite inference—that Nichols is quite unlikely to have been acting to advance Jacobs' interests by pushing Tolson to enter into the plea agreement and cooperate with the government.[4]

If the strong presumption against finding an attorney's conduct to be unreasonable is to mean anything at all, it must at least mean that a defendant's burden of persuasion on an ineffective assistance claim cannot be discharged by naked assertions and counterintuitive hypotheses alone. *See Taylor*, 139 F.3d at 931 (attenuated or speculative hypothetical conflicts do not warrant relief under *Cuyler*): *Bucuvalas*, 98 F.3d at 657 (link between counsel's conduct and interests alleged to conflict with defendant's too tenuous to support finding of *Cuyler* actual conflict). Where the defendant's theory of conflict of

---

4. Also in her reply brief, Tolson makes the assertion that Nichols intended to "abandon" Tolson after the entry of her guilty plea. *See* Def.'s Reply at 4. First, this assertion does not reconcile the fact that Nichols pushed for the cooperation agreement with the observation that Jacobs' interests in not being incriminated are obviously adversely affected by the execution of such an agreement. After all, the agreement was already executed, and the government and the Court would primarily enforce Tolson's agreement to cooperate, even if Nichols in fact later "abandoned" her. Second, if Jacobs had instructed Nichols to first force Tolson into the plea agreement to prevent her from incriminating Jacobs at trial and then to ensure that Tolson never in fact cooperated with the government, it stands to reason that Jacobs would have wanted Nichols to continue as Tolson's lawyer rather than abandon her, so that Nichols might prevent Tolson from assisting in the government's investigation at some point in the future. Third, there is simply no evidence to corroborate the assertion that Nichols intended to abandon Tolson or to discourage her from cooperating—to the contrary, the record reflects at least two occasions on which Nichols pushed for the government to debrief with Tolson at earlier dates than the government was willing to accept. *See* Tr. (Stat.Conf., Oct. 24, 2003), at 5 (After the government requested that Tolson enter long-term drug treatment, Nichols stated that he "had suggested to the government and to [Tolson] that they work with her before going to a drug program . . . . But the government is not prepared to work with her until [she completes drug treatment]."); Tr. (Stat.Conf., Jan. 16, 2004), at 2–3 (Nichols requested that Tolson debrief with the government within 30 days, which would have been immediately after her completion of drug treatment, but the government remained unwilling to debrief with her until she had finished rehabilitation and enough time had passed to determine whether "we can get her back on track." The government indicated that Tolson should come in to debrief two weeks or more after her completion of drug treatment.). Finally, Nichols explained to the Court on the record that he filed his motion to withdraw because Tolson had "formalized and submitted to the Court allegations [in her letter to the Court] that clearly place me in . . . a clear conflict that impedes my ability to represent her . . . ." Tr. (Hrng., Dec. 12, 2003), at 2. Far from advancing some predetermined plan to abandon Tolson after entry of her guilty plea, then, Nichols moved to withdraw as Tolson's attorney only because of the letter Tolson submitted to the Court that supposedly evidences Nichols unreasonable conduct.

interest is speculative, and the more natural interpretation of the factual record supports a finding of no conflict of interest, the strong presumption of attorney reasonableness prompts the Court to find no *Cuyler* conflict. Such is the case here, and thus the Court concludes that Tolson has failed to demonstrate any actual conflict of interest within the meaning of *Cuyler*.

Tolson cites but one case in support of her conflict of interest argument. In *Wood v. Georgia*, the Supreme Court addressed a situation where two defendants' legal fees were paid by their employer, who might also have been implicated in the criminal conduct with which the defendants were charged. *See Wood v. Georgia*, 450 U.S. 261, 263–265, 268–69, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Because the arrangement carried the inherent danger that "the lawyer [would] prevent his client from obtaining leniency by . . . offering testimony against the former employer," *id.* at 269, 101 S.Ct. 1097, along with other risks, the *Wood* Court was concerned about the effect that this potential conflict of interest might have had upon the attorney's representation of the defendants during certain proceedings in the trial court. *See id.* The Court explained, in the section referenced in Tolson's motion, that "the *possibility* of a conflict of interest was sufficiently apparent . . . to impose upon the court a duty to inquire further." *Id.* at 273, 101 S.Ct. 1097. *See* Def.'s Reply at 5 (citing *Wood* ). This statement, Tolson would like to argue, demands that a district court either conduct a hearing or, perhaps more ambitiously, grant a withdrawal motion upon recognition of the mere possibility of a conflict of interest.

The Supreme Court's statement in *Wood*, however, means no such thing. First and most obviously, such a reading of the relevant passage would conflict with the legal standards governing both conflict of interest claims under *Cuyler* and *Strickland*—each of which requires more than the mere possibility of a conflict to warrant relief-and the Court's standard for adjudicating withdrawal motions set forth above, which requires that the movant establish, and not merely hint at, some defect in the plea proceedings. *Wood* was decided after *Cuyler*, and the *Wood* Court makes no mention of any intention to overturn that decisions or carve out an exception to its applicability. Thus, Tolson's proposed interpretation of the relevant section of *Wood* must be incorrect. Of course, even a cursory examination of *Wood* makes obvious the actual meaning of the statements at issue.

The *Wood* Court was concerned with the adequacy of the defendants' representation at a probation-revocation hearing in the trial court. Because the Court observed a potential conflict of interest, it concluded that the defendants may have been deprived of their Sixth Amendment right to counsel at that lower court proceeding. *See Wood*, 450 U.S. at 269–72, 101 S.Ct. 1097. The *Wood* Court's decision, however, was predicated on the potential due process violation inherent in the lower court's failure to make a reasonable inquiry into this potential conflict of interest at the time of the hearing. *Id.* at 272–73, 101 S.Ct. 1097. The Court held that the defendants' due process rights, rather than their right to counsel, compelled remanding the case to the trial court for further inquiry into the adequacy of the defendants' representation at the revocation hearing. *Id.* at 273–74, 101 S.Ct. 1097. However, *Wood* contains no actual evaluation of the potential conflict of interest on the facts of the case other than the observation that there was, in fact, the potential for a conflict of interest. Because the Court herein investigates Tolson's conflict-

of-interest allegations thoroughly, as the lower court was instructed to do in *Wood*, there is no admonition in *Wood* that alters the disposition of the present motion.[5] To be sure, the *Wood* Court acted on observation of a potential conflict of interest, but the only action taken was to remand to the trial court for precisely the sort of detailed inquiry into the conflict that this Court undertakes herein.

Now despite the failure of her *Cuyler* claim, Tolson may yet demonstrate ineffective assistance of counsel—and thereby satisfy the central requirement of the Court's standard for withdrawal of guilty pleas—by satisfying the *Strickland* test. That is, although the Court has concluded that Nichols' conduct did not flow from an underlying conflict of interest, Tolson may demonstrate in the alternative that Nichols' conduct was objectively unreasonable and prejudiced her defense. Such a showing would satisfy the "taint" requirement for withdrawal of a guilty plea just as well as establishing a *Cuyler* conflict, as both amount to an unconstitutional denial of Tolson's right to effective assistance of counsel. Having failed to show a *Cuyler* conflict, however, makes Tolson's task more difficult, as *Strickland* requires the ineffective assistance claimant to persuade the Court that but for counsel's objectively unreasonable actions, there is a reasonable probability that the results of the relevant criminal proceeding would have been different.

Recall that under *Strickland*, a claimant must show both that counsel's performance fell below an objective standard of reasonableness and that counsel's defective performance prejudiced the defense. *See Hill*, 474 U.S. at 58–59, 106 S.Ct. 366. Where the ineffective assistance claim is made in a motion to withdraw a guilty plea, *Strickland's* prejudice prong requires that the claimant convince the court that "but for counsel's [alleged] errors, [the defendant] would have pleaded not guilty and insisted upon going to trial[.]" *Horne*, 987 F.2d at 835 (citing *Hill*, 474 U.S. at 59, 106 S.Ct. 366). Absent a showing of prejudice, the defendant "cannot be said to have received ineffective assistance of counsel." *Id.* "[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing of one." *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052; *see also Horne*, 987 F.2d at 835. Here, because the Court finds that Tolson fails to demonstrate that any of Nichols' allegedly deficient actions actually prejudiced her during the proceedings leading up to the entry of her guilty plea, there is no reason to address the question whether any of Nichols' challenged conduct fails to adhere to *Strickland*'s objective standard of reasonableness.

▬▬▬ In order to demonstrate prejudice in the context of an ineffective assistance challenge to the entry of a guilty plea, "[i]t is clear enough that a defendant must make more than the bare allegation

---

**5.** One might think that the holding in *Wood* compels this Court to hold an evidentiary hearing regarding Tolson's allegations. However, the facts of *Wood* were substantially indicative of a conflict of interest, and the *Wood* Court found that the lower court simply disregarded the potential conflict when the issue was raised by counsel for the state. The conflict in this case, however, is detailed by Tolson's allegations alone. The Court thoroughly reviews those allegations in this Opin-

ion. And, to reiterate, the governing rule in this circuit requires an evidentiary hearing on a withdrawal motion in most cases, but allows for summary disposition where the Court finds that the claimant has failed to allege sufficient facts to warrant such a hearing. As the Court has made such a finding here, and because the allegations in Tolson's motion are easily resolved on the present pleadings and record, there is no need for an evidentiary hearing on the present motion.

that he 'would have pleaded differently and gone to trial.'" *Horne,* 987 F.2d at 836 (quoting *Key v. United States,* 806 F.2d 133, 139 (7th Cir.1986)); *accord Gargano v. United States,* 852 F.2d 886, 891 (7th Cir.1988). This threshold requirement is certainly appropriate even though "the prejudice part of the *Hill–Strickland* test may pose a difficulty in some cases because it is by no means obvious how a court is to determine the probability that a defendant would have gone to trial" but for some conduct of defense counsel. *Id.* at 835–36. After all, the *Strickland* test requires more than a showing of "some probability" that the defendant would have plead differently and gone to trial. Such a standard would likely be satisfied by the defendant's naked assertion that she would have gone to trial if not for deficient assistance of counsel. However, the Supreme Court's specification that a defendant must establish a *"reasonable* probability" that the outcome of the proceedings would have been different must at least mean that more than the bare allegation to that effect in a pleading is required. Otherwise, the addition of the word "reasonable" would be meaningless. Here, then, because Tolson does no more than assert that she would have gone to trial if not for Nichols' various challenged actions, her claim is simply insufficient to make out ineffective assistance under *Strickland.* Indeed, Tolson did not even file a sworn affidavit containing her assertion of prejudice along with her motion, but rather made that assertion in the text of her reply brief. Without more, then, the Court must conclude that Tolson's ineffective assistance claim fails.

■ This conclusion is only underscored by an examination of the proceedings at the June 30, 2003 plea hearing. The D.C. Circuit explains that "the court uses the Rule 11 colloquy to dispel any misconceptions that the defendant may have about his likely sentence and to ensure that his plea is not the result . . . of promises apart from the plea agreement." *Horne,* 987 F.2d at 838. After the colloquy, then, "if the information given by the court . . . corrects or clarifies the earlier erroneous information given by the defendant's attorney and the defendant admits to understanding the court's advice, the criminal justice system must be able to rely on the subsequent dialogue between the court and the defendant." *United States v. Lambey,* 974 F.2d 1389, 1395 (4th Cir.1992) (en banc) (as cited in *Horne,* 987 F.2d at 838) (internal quotation marks and citations omitted). For this reason, "in challenging a guilty plea on the basis of ineffective assistance, the representations of the defendant at the plea hearing as to the adequacy of counsel and the knowing and voluntary nature of his plea . . . may 'constitute a formidable barrier' to his later refutations." *Taylor,* 139 F.3d at 933 (citing *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)).

At the Rule 11 plea colloquy held by the Court on June 30, 2003, the following exchange took place between the Court and defendant Tolson:

THE COURT: . . . Have you had adequate opportunity now to discuss your case with your attorney, Mr. Nichols?

THE DEFENDANT: Yes, sir.

THE COURT: Are you satisfied with Mr. Nichols' representation of you in this matter?

THE DEFENDANT: Yes, sir.

THE COURT: You understand that under the Constitution and laws of the United States, you are entitled to a trial by jury on these charges?

THE DEFENDANT: Yes, sir.

. . .

THE COURT: You understand that if I accept your plea you will waive these

rights; there will be no trial and I will enter a judgment of guilty on your plea alone today?

THE DEFENDANT: Yes, sir.

. . .

THE COURT: Having discussed your rights with you, do you still wish to plead guilty?

THE DEFENDANT: Yes, sir.

. . .

THE COURT: Counsel tells me that the maximum penalty on Count 1 is life in prison with a minimum of ten years in prison and a fine not to exceed $4 million, plus a period of supervised release of at least five years and a $100 statutory special assessment that is required to be imposed, and that Count 2 carries a minimum term of five years to run consecutive to any other sentence. So you understand that's what the statutory penalties would be[?]

THE DEFENDANT: Yes, sir.

THE COURT: Now, you and your attorney have talked about how the sentencing commission guidelines might apply to you, I take it[?]

THE DEFENDANT: Yes, sir.

THE COURT: You understand that I won't actually be able to determine the guideline sentence in your case until after a presentence report has been completed and you and the government have had an opportunity to challenge the facts that are reported to me[?]

THE DEFENDANT: Yes, sir.

THE COURT: You understand that after it's determined what guideline applies in the case, I have authority in some circumstances to impose a sentence that is more severe or less severe than the sentence called for by the guideline[?]

THE DEFENDANT: Yes.

. . .

THE COURT: Has anyone threatened you or anyone else or forced you in any way to enter this guilty plea?

THE DEFENDANT: No, sir.

. . .

THE COURT: Okay. Let me hand down this plea agreement to you . . .

MR. NICHOLS: We have a copy of that in front of us.

THE COURT: Okay. I want [the defendant] to see her signature there on the next to last page and tell me if that is your signature.

THE DEFENDANT: Yes, sir.

. . .

THE COURT: Would you give us a brief description of [the plea agreement], Mr. Nichols, so I can be sure the defendant understands it?

MR. NICHOLS: . . . I have informed the defendant that at this stage, she cannot be informed either by me or the Court as to what sentence she is subject to with the exception of what the mandatory minimums are and what the upper levels are.

. . . I have told [the defendant] that 15 years is mandatory time. There will be no discounts on that time by the Court unless the government approaches the Court with [documentation of the defendant's substantial cooperation and recommendation for a downward departure at sentencing on that basis] which will then authorize the Court to go under the mandatory minimums. I have informed [the defendant] that even if the government comes forward, the final decision will be made by the Court, and if she takes the plea, the plea is binding and the Court will not allow her to take the plea back.

THE COURT: . . . Understand all that?

THE DEFENDANT: Yes, sir.

THE COURT: Have any questions at all about it because I'm the one who can resolve them[?]

THE DEFENDANT: No, sir, I don't.

THE COURT: You agree to it[?]

THE DEFENDANT: I agree to [it].

THE COURT: Okay. Has anyone made any prediction or promise as to what sentence I will give you here?

THE DEFENDANT: No, sir.

THE COURT: You understand they can't because I don't know myself right now.

THE DEFENDANT: Yes, sir, I understand.

THE COURT: I will get a presentence report, I will hear from you and your attorney and from the government at the time of sentencing; you understand that[?]

THE DEFENDANT: Yes, sir.

Tr. (Plea, June 30, 2003), at 3–9.

Thus, even assuming the truth of Tolson's assertion that Nichols' promised that she would be sentenced to no more than probation if she plead guilty, the Court more than offset any prejudice that might have flowed from that misinformation by carefully detailing the nature of the sentencing process. "[W]hen a defendant is told during [her] Rule 11 hearing that [she] cannot rely upon the sentencing estimate of [her] counsel ... it is difficult to see the unfairness or injustice of holding [her] to [her] bargain...." *Horne*, 987 F.2d at 838. The Court's conclusion that Tolson has failed to demonstrate that Nichols' alleged representations regarding sentencing prejudiced Tolson during the plea proceedings, coupled with the observation that Tolson's allegation in this regard is only that—a bare allegation—compels the Court to conclude that Nichols' alleged misrepresentation about Tolson's sentence cannot support a finding of inef-

fective assistance under *Strickland* sufficient to merit withdrawal of the guilty plea.

Similarly, Tolson's allegation that Nichols' discouraged her about her chances of success at trial and thus forced her to plead guilty cannot support relief on the present motion. Nichols' "harsh" words to Tolson allegedly began "the second [Tolson] was released from jail," Def.'s Reply at 5. The Court will assume for present purposes that these admonitions were delivered throughout the period of time between Tolson's initial arrest and her entry of the guilty plea on June 30, 2003.

In a similar case, the D.C. Circuit reviewed an ineffective assistance challenge in which the defendant's attorney allegedly "misadvised him that he had to plead guilty ... or at least failed to make sure that [the defendant] did not have that misunderstanding." *Farley*, 72 F.3d at 164. In *Farley*, the court found that there was no evidence that the "lawyer told [the defendant] either that he had to plead guilty or that he could not request a jury trial." *Id.* at 164 n. 6. The defendant's affidavit stated, rather, that the attorney advised the defendant that he " '*should* plead guilty to the charges.' " *Id.* (quoting defendant's affidavit) (emphasis added by D.C. Circuit). The court found that this advice "was not unreasonable, especially in light of the charges," and therefore concluded that this aspect of counsel's assistance was constitutionally adequate and as such an insufficient basis for the withdrawal of a guilty plea. *See id.* at 164–65. Judge Kaplan echoed the D.C. Circuit's conclusion in *Farley* in rejecting an ineffective-assistance claimant's argument that his defense attorney forced him to plead guilty by telling him that he "had no chance to win at trial," when he explained that "the alleged coercion amounted to no more than [the defendant's] lawyer giving

him unvarnished advice," which was "professionally appropriate" and indicative of effective, rather than ineffective, assistance of counsel. *See Hines v. Miller*, 156 F.Supp.2d 324, 330–33 (S.D.N.Y.2001).

Here, as in *Farley* and *Miller*, Tolson has not alleged that Nichols told her that she had no choice but to plead guilty. Rather, the statements Tolson attributes to Nichols are more consistent with professionally appropriate "unvarnished advice" than with coercion of some kind. Moreover, at the June 30, 2003 Plea Hearing, the Court asked Tolson: (1) whether she understood "that under the Constitution ... [you are] entitled to a trial by jury on these charges;" Tr. (Plea, June 30, 2003), at 4; and (2) whether "anyone [had] threatened you or anyone else or forced you in any way to enter this guilty plea." Tr. (Plea, June 30, 2003), at 7. Tolson replied, under oath, that she understood that she had the right to request a jury trial and that she had not been coerced into entering the guilty plea. *See id.* at 4, 7. Taking these statements together with the lack of specific allegations and the content and tone of the actual statements Nichols made, it seems most likely that Nichols' statements amounted to no more than appropriate, even if grim, advice based on his assessment of the case. And, if the statements actually did evidence coercion, Tolson had ample opportunity to notify the Court of that fact at the Rule 11 hearing.

In both *Farley* and *Miller*, differences in facts and procedural posture motivated the courts to consider other allegations of ineffective assistance before denying the defendants' requests for relief. However, both courts summarily rejected what they found to be no more than appropriate legal advice as a potential basis for finding ineffective assistance. In *Miller*, for example, the Court explained that "allegations ...

that the attorney strongly urged a guilty plea on the ground that the defendant was unlikely to prevail at trial and would wind up serving a shorter sentence by pleading guilty, even if characterized as coercion[,] do not create an actual conflict for the simple reason that counsel was not accused of misconduct." *Miller*, 156 F.Supp.2d at 332. Indeed, considering the circumstances and the charges in this case, Nichols might have more closely approached ineffective assistance had he repeatedly assured Tolson of probable *success* at trial and discouraged her from pleading guilty. Accordingly, this Court concludes that Tolson has failed as a threshold matter to allege that Nichols' "discouraging" statements even constitute attorney misconduct. Moreover, the Court advised Tolson of her right to go to trial at the Rule 11 hearing, after which Tolson nevertheless averred that she wished to plead guilty. As such, the Court concludes that Tolson's allegation regarding Nichols' statements cannot support a finding of prejudice under *Strickland*. Because there can be no finding of ineffective assistance on this allegation, Tolson's withdrawal motion cannot be granted on this ground.

■ Finally, the Court turns to Tolson's charge that Nichols failed to adequately discuss her potential defenses and other matters related to trial strategy prior to entry of her guilty plea. Specifically, Tolson alleges that Nichols avoided discussing the tactic of incriminating Freddie Jacobs in order to secure Tolson's acquittal. Of course, Tolson submits no affidavit or other evidence of any kind to substantiate this allegation. Further, the Court again notes that Tolson's attestation at the June 30, 2003 Rule 11 hearing that she was satisfied with Nichols' representation of her during the plea proceedings creates "a formidable barrier" to a later refutation. *See Allison*, 431 U.S. at 74, 97 S.Ct. 1621;

*Taylor,* 139 F.3d at 933. See also *Horne,* 987 F.2d at 837 ("It is neither unfair not unjust ... to hold the defendant to his solemn representation to the court" at the Rule 11 hearing.). Now this barrier, "although imposing, is not invariably insurmountable." *Id.* However, if the court concludes that "the defendant's conclusory allegations are unsupported by specifics, or that the defendant's allegations in the face of the record are wholly incredible," *Taylor,* 139 F.3d at 933 (internal quotations, citations, and brackets omitted), the Court will rely upon the defendant's statements at the plea colloquy and deny withdrawal of the guilty plea.

The Court has already noted that Tolson's allegations are unsupported by either factual submissions or citations to the record in this case. Moreover, the Court finds Tolson's alleged lack of knowledge of the possibility that incriminating Jacobs might constitute a viable defense at trial to be "wholly incredible" in light of the record. It is undisputed, and corroborated by Tolson's statements on the record, that Tolson had read and understood the plea agreement, which included a provision that she cooperate with the government in an effort to bring criminal charges against Jacobs. It follows that any reasonable person in Tolson's position must have had at least some idea that Jacobs might be criminally liable for the same transaction upon which the charges against Tolson are predicated. Additionally, Tolson's assertion that she knew before she entered her guilty plea that Nichols was being paid by Jacobs, and that she was concerned that Nichols might not have her best interests at heart for that reason, casts further doubt on her already dubious challenge to the plea proceedings. If she knew Jacobs was paying Nichols to defend her, and if she was concerned that Jacobs might encourage Nichols to keep Tolson off the witness stand as a condition of that pay-

ment, then it follows that Tolson must have had some idea that she had the option to testify in a manner that would incriminate Jacobs. Her concern about Nichols' possible conflict of interest, then, betrays at least some knowledge of the possible defense about which she now claims utter ignorance prior to the plea hearing.

In accordance with these observations, the Court finds it "wholly incredible" that Tolson could have been ignorant of the possible defense of blaming Jacobs. There is no factual proffer from the defendant to substantiate Tolson's claim in this regard. Indeed, the claim is in direct tension with several aspects of the record in this case. Certainly, Tolson makes no allegation that she would not have plead guilty and that she would instead have insisted upon going to trial had she received the information she claims that Nichols withheld. As such, there can be no *Strickland* prejudice flowing from Nichols' alleged failure to explore that defense with her prior to pleading guilty. Thus, this allegation, like the others discussed above, cannot support a finding of ineffective assistance.

■■■ Having determined that Tolson's allegations are insufficient to establish ineffective assistance of counsel under either *Cuyler* or *Strickland,* the Court concludes that Tolson cannot demonstrate that the plea proceedings were either procedurally or constitutionally tainted, as required by the third element in the withdrawal standard set forth in *United States v. West* and discussed above. Accordingly, Tolson "has to shoulder an extremely heavy burden if [she] is ultimately to prevail" on her withdrawal motion. *See Cray,* 47 F.3d at 1208. As the government has not made a claim of prejudice to the prosecution in its opposition to the withdrawal motion, the merit of that motion now turns solely on the

substantiality of Tolson's claim of innocence. Again, the general interest of the legal system in finality in the plea process militates strongly against allowing the withdrawal of a guilty plea, where the Court finds no defect in the procedure by which it was entered, absent the most compelling of circumstances indicating the innocence of the defendant.

 Tolson's allegations of innocence, however, fall far short of satisfying this burden. Indeed, her innocence argument amounts to no more than a general denial of the facts in the governments proffer to which she admitted at the Rule 11 hearing. At that hearing, the following exchange took place between the Court and defendant Tolson:

THE COURT: ... The government ... attached at the back [of the plea agreement] a factual proffer. Let me hand that down to you, and tell me if that is your signature on that page, too.

THE DEFENDANT: Yes, sir.

THE COURT: Did you read that over carefully?

THE DEFENDANT: Yes, sir, I have read it.

THE COURT: The factual proffer?

THE DEFENDANT: Yes.

THE COURT: Okay. Is that true? Is this what really happened?

THE DEFENDANT: Yes, sir.

THE COURT: So you had these drugs and these two guns?

THE DEFENDANT: Yes, they was [sic] in my possession.

THE COURT: Okay. So you are, in fact, guilty.

THE DEFENDANT: Yes, sir.

Tr. (Plea, June 30, 2003), at 9–10. The government's factual proffer discussed in the plea colloquy contained a brief recitation of the nature and locations of the narcotics and firearms found in Tolson's residence, as well as the statement that the "defendant admits that she and Mr. Jacobs possessed the crack cocaine with the intent to distribute it and that the guns were possessed during and in relation to that crime."

In her reply in support of her withdrawal motion, Tolson asserts that she "never possessed, or intended to possess, the ... crack cocaine police recovered from inside [the location that evidence indicates was her residence]," Def.'s Reply at 2, but that Freddie Jacobs alone possessed and intended to distribute the crack. Tolson also claims that the nine millimeter firearm that the police recovered "was not [her] property or possession" and that she was "unaware of its existence." *Id.* at 3. Tolson admits, however, to possession of a small amount of PCP and a .25 caliber firearm also recovered by the police. *Id.* at 2. Tolson's claim of innocence, then, is no more than a partial retraction of her admissions and stipulation to the government's factual proffer made at the June 30, 2003 plea hearing.

In *United States v. Barker*, the case that established the current standard governing motions to withdraw guilty pleas made prior to sentencing, the D.C. Circuit explained the rationale for requiring a claimant to demonstrate some flaw in the plea proceedings in addition to making a claim of actual innocence. *See Barker*, 514 F.2d at 218–21. "Were mere assertion of legal innocence always a sufficient condition for withdrawal," the Court of Appeals reasoned in *Barker*,

withdrawal would effectively be an automatic right. There are few if any criminal cases where the defendant cannot devise some theory or story which, if believed by a jury, would result in his acquittal. ... Were withdrawal automatic in every case where the defendant

decided to alter his tactics and present his theory of the case to the jury, the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim. In fact, however, a guilty plea is no such trifle . . . .

*Id.* at 221. Of course, it cannot be the case that no withdrawal motion will ever be granted where the defendant fails to demonstrate that the plea proceedings were somehow deficient. However, withdrawal motions will be granted on evidence of actual innocence alone only when that evidence is of the most compelling sort—for example, exculpatory DNA evidence or a newly discovered and credible alibi witness might, if proffered in a withdrawal motion, compel the Court to grant relief.

Tolson's innocence claim, however, is not of this compelling sort. To the contrary, innocence claims constituting mere recantations of earlier admissions of guilt, if found sufficient to support the withdrawal of guilty pleas, would have precisely the effect on the criminal justice system that the *Barker* Court was concerned to prevent. This is the most basic sort of innocence claim, amounting to the simple statement "I am innocent, despite what I admitted before." Surely more must be required if we are to preserve the "solemn" institutional device of the guilty plea. At the very least, a defendant making such a claim should have to satisfy an increased evidentiary burden of persuasion, requiring that he or she proffer substantial facts in support of the innocence claim. On this standard, too, Tolson fails. She proffers no facts at all. She did not even attach a sworn affidavit to her motion in which she denies ownership of the nine millimeter pistol and 135 grams of crack. The assertions are made in the text of the motion only, and this Court finds them insufficient, without significantly more, to support relief on a withdrawal motion where no showing of procedural or constitutional defect in the plea proceeding has been made. Accordingly, Tolson's motion will be denied and her sentencing shall proceed as scheduled.

## CONCLUSION

Having determined that Tolson's conflict of interest and ineffective assistance of counsel claims fail under the applicable legal standards, and having concluded that Tolson's claim of innocence is not nearly compelling or well-documented enough to support withdrawal of her guilty plea in the absence of a showing that the plea proceedings were tainted, the Court will deny the defendant's motion to withdraw her guilty plea.

A corresponding Order will issue this date.

## *ORDER*

Upon consideration of defendant Carol Tolson's Motion to withdraw her guilty plea, the opposition thereto, the applicable law, and the entire record herein; and in accordance with the Memorandum Opinion issued this date; it is hereby

ORDERED that the defendant's Motion is DENIED.

SO ORDERED.